Filed 4/6/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074098 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD268493) |
| JEREMIAH IRA WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth So, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Daniel J. Hilton and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts A, B, C, D, & F.

A jury found defendant Jeremiah Ira Williams guilty of first degree robbery (Pen. Code,[1] §§ 211 & 212.5, subd. (a), count 1); four counts of making a criminal threat (§ 422, counts 2, 8, 9 & 11); two counts of forcible rape (§ 261, subd. (a)(2), counts 3 & 6); sexual penetration by use of force (§ 289, subd. (a), count 4); forcible oral copulation (former[2] § 288a, subd. (c)(2)(A), count 5); burglary of an inhabited dwelling (§§ 459 & 460, subd. (a), count 7); battery and assault, as lesser offenses of sodomy by use of force (§§ 240 & 242, count 10); assault with a deadly weapon (§ 245, subd. (a)(1), count 12); and false imprisonment by violence (§§ 236 & 237, subd. (a), count 13). Counts 1-8 were committed against Jane Doe 1; and counts 9-13 were committed against Jane Doe 2.

The jury also found defendant personally used a firearm in counts 1, 3, 4, 5, and 6 (§ 12022.53, subd. (b)); personally used a firearm in counts 2, 7, and 11 (§ 12022.5, subd. (a)); kidnapped Doe 1, committed the offenses in the commission of a burglary, and inflicted great bodily injury in counts 3, 4, 5, and 6 (§§ 667.61, subds. (a), (c), (d) & (e) & 667.5); and committed the burglary in count 7 with another person present, other than an accomplice (§ 667.5, subd. (c)(21)). The jury, however, found defendant did not commit forcible sexual offenses against more than one victim (§ 667.61, subds. (a), (c), & (e)).

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

[2]    Effective January 1, 2019, former section 288a was renumbered to section 287. (Stats. 2018, ch. 423, § 49.)

The court sentenced defendant to a term of 100 years to life plus 86 years two months. It also imposed a $10,000 restitution fine (former[3] § 1202.4, subd. (b)) and a matching suspended parole revocation restitution fine (§ 1202.45), as well as other fines, fees, and assessments as discussed *post*.

Defendant on appeal claims the court: (1) lacked statutory authority to remove him from the courtroom because his trial had yet "commenced in his presence" (see § 1043, subd. (b)), after defendant ignored the court's myriad warnings not to disrupt the proceedings, addressed the jurors directly as they entered the courtroom, and repeatedly disclosed his dissatisfaction with counsel and certain rulings made by the court; (2) erred in refusing his "request" to self-represent, which he made in connection with a *Marsden*[4] hearing held during a break while the parties were in the middle of jury selection; and (3) erred in failing to declare a mistrial, dismiss the venire, and begin jury selection anew, after his outburst and removal from the courtroom.

Defendant further claims: (4) the matter should be remanded to allow the court to exercise its discretion and consider whether to grant him mental health diversion; (5) his equal protection rights have been violated because he is statutorily ineligible for a youth parole hearing under section 3051 as a result of being a one-strike offender; and (6) the

---

[3] The Legislature amended section 1202.4 effective January 1, 2019. (See Stats. 2018, ch. 92 (Sen. Bill No. 1289), § 165, eff. Jan. 1, 2019; Stats. 2018, ch. 142 (Assem. Bill No. 2226), § 1, eff. Jan. 1, 2019.) This amendment has no substantive bearing on the issues presented in this case.

[4] See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

imposition of fines, fees, and assessments was made without a finding of his ability to pay.

As we explain, we reject these claims and affirm the judgment.

FACTUAL BACKGROUND[5]

*Doe 1*

On August 13, 2016, Doe 1 was living in an apartment located on Nobel Drive in San Diego. At about 6:00 p.m., Doe 1 went with friends to Mission Bay for a barbecue. Doe 1 did not consume any alcohol at the barbecue. At about 10:00 p.m., a friend dropped Doe 1 off at the front gate of her apartment complex. Doe 1 testified that any pedestrian could "freely" walk through the gate and enter the complex.

After being dropped off, Doe 1 headed to her apartment carrying a bag and a Cajon box, which she described as a small drum. As she was walking through the garage, she became aware of a man she did not know about 50 yards behind her.

The man asked Doe 1 if she needed help carrying her "stuff." Doe 1 responded she was "managing fine." As she continued walking, the man next asked about her husband. Doe 1 ignored the man. As she approached her apartment, Doe 1 put down her Cajon box and, to her surprise, saw the man standing in the hallway leading to her unit.

Although concerned, Doe 1 nonetheless approached the man, and asked if he needed help. The man pretended to be talking on his phone, and responded he was

---

[5]     We summarize the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.)

looking for "someplace" on the other side of the tennis court. Doe 1 told the man there was a map of the apartment complex near the tennis court.

After their short conversation, Doe 1 tried to "sneak" into her apartment and lock the door before the man could react. However, as soon as she unlocked the door and began opening it, the man rushed her, causing her to fall to the ground. Scared and in shock, Doe 1 started screaming. The man put a gun to her forehead and told her not to make any more noise. He then demanded money and her necklace.

As Doe 1 pulled out her wallet, the man said, "you better have a hundred bucks in there." Because she had about $1 on her person, Doe 1 said she was "sorry" and offered to get cash from an ATM. The man told Doe 1 he "didn't want to kill [her], but he would if he had to." Believing her life was "going to end," Doe 1 handed the man her wallet, necklace, and cellphone.

The man demanded entry into Doe 1's apartment. Doe 1 instead just sat on the ground outside her front door, repeatedly telling the man she was willing to go with him to an ATM. After again refusing to accompany him into the apartment, the man suddenly put his hands around Doe 1's neck and began "strangl[ing]" her. Doe 1 estimated the man strangled her for about a minute, then let go, and again demanded they enter her apartment. This time she complied.

As they entered her living room, the man grabbed Doe 1 from behind and again strangled her, this time using a "towel-like object." Believing she was going to die, Doe 1 fought back, causing the man to loosen the object around her neck. The man again

5

demanded money and valuables.  Doe 1 went to a bookshelf where she kept money and gave the man about $300.

While still in the living room, the man told Doe 1 his name was "John."  He also told her if she called police, he would kill her.  Using a closed fist, the man punched Doe 1 a "few times" in the face, causing her to fall to the ground and making it difficult for her to see.  Doe 1 subsequently learned these blows had fractured her face.

The man next removed Doe 1's pants, and demanded they go into her bedroom.  When she refused, the man forcefully "dragged" her into the bedroom and removed her remaining clothes.  Doe 1 then clearly saw the man's face as the bedroom was lit.  Doe 1 previously testified she was "very sure" the man who attacked her was defendant Williams.[6]

While on the bed, the man penetrated Doe 1's vagina with his penis.  He next digitally penetrated her vagina at least five times, and used his hands to touch her breasts.  At some point, the man pushed Doe 1 onto her knees, and forced her to orally copulate him.  The man then made Doe 1 get back on the bed, and used his penis to penetrate her vagina a second time.  Doe 1 testified she complied with the man's ongoing demands because she believed he otherwise would kill her.  The man then ejaculated on, but not "in[]," Doe 1.

The man demanded Doe 1 go with him to the bathroom.  She reluctantly complied.  Once in the bathroom, he demanded more of her valuables.  Doe 1 gave the man a pair of

---

6    As discussed *post*, defendant was not present in the courtroom during Doe 1's testimony as he voluntarily absented himself during his trial and sentencing.

earrings she kept in a "square transparent box."  He next made Doe 1 take a shower. Using a washcloth, the man wiped her face and vagina, both of which were bleeding. The man then closed the shower curtain.  Doe 1 estimated she stayed in the shower for about 20 more minutes, as she did not know if the man was still inside her apartment. She eventually got out of the shower and dried off.  Doe 1 found the man had left her apartment, and had taken her laptop and an "old cell phone."

Because she had no electronic devices, Doe 1 waited a while longer to go outside for help.  Once outside, she saw the lights on in a neighbor's apartment.  Doe 1 contacted the neighbors, informed them of the attack, and they drove her to a nearby hospital.

Doe 1 described her injuries for the jury.  They included among others bruising to her face, neck and chest, which lasted for months; stiches inside her mouth; vaginal bleeding; inability to walk for days because of the injury to her vaginal area and the "rest of [her] body"; and a facial fracture that caused the left side of her face to be "lower" than the right side.

Witness C.M. testified he was living in an apartment near Doe 1's on the night she was attacked.  At about 10:30 p.m., he heard a knock on the front door.  C.M.'s fiancé R.P. answered the door.  R.P. testified he immediately knew something was wrong as Doe 1's face was swollen, she was hunched over, and she was barely able to speak.  R.P. invited Doe 1 into their apartment.

Once inside, C.M. saw Doe 1, describing her appearance to the jury as follows: "Her right face was completely hematoma'd on the whole cheek was swollen really far out.  There was blood all over the place.  Dripping wet.  Completely wet.  Hair was wet.

7

Blood all over the chest and on some of the clothes as well." C.M. noted Doe 1 appeared "[v]ery scared" and "[v]ery confused, as she kept repeating, "He beat me. He beat me. He beat me."

After calling 911 and being told by dispatch it would "take them a little bit [of time] to get there," C.M. offered to drive Doe 1 to a nearby hospital emergency room. On the way to his car, C.M. and Doe 1 briefly entered her apartment, as C.M. sought to find contact information to notify her family and/or a friend of the attack. C.M. made sure not to touch anything inside the apartment. C.M. testified inside Doe 1's apartment he saw "chucks of hair"; "numerous" bloody handprints on a doorway, with blood smeared all over the door; and "puddles of blood in the bed as well as soaking wet clothes and towels in the bathroom floor in front of the shower."

As they drove to the hospital, Doe 1 told C.M. she had been beaten and raped. C.M. called a friend who worked at the hospital to let him know they were on the way. After making sure Doe 1 was receiving treatment at the emergency room, C.M. returned home and waited with his fiancé for the police.

San Diego Police Officer Garry Davis was on patrol on the night of August 13. At about midnight, Officer Davis was dispatched to a hospital emergency room. Officer Davis met with Doe 1 in the trauma center and saw she had "severe physical trauma to her face and . . . was traumatized psychologically" as well. Officer Davis obtained a statement from Doe 1 and took myriad photographs of her injuries.

*Doe 2*

Doe 2 was "prostituting" on August 14, 2016—the day after the attack on Doe 1—at a motel located off Alvarado Canyon Road in San Diego. Doe 2 testified she met a fellow prostitute at the motel, although each had their own rooms. Doe 2 estimated she checked-in to the motel at about 3:00 p.m. Before going to the motel, Doe 2 posted an "ad" on the internet informing potential "clients" of her general location.

At some point that day, a man contacted Doe 2 and they set up a meeting, or what she referred to as a "session," in her motel room. The man told Doe 2 he wanted an hour of her time and had $200. Doe 2 testified that she agreed to have vaginal intercourse with the man as long as he wore a condom, but that at no time did she agree to have "anal sex" with him.

Sometime after dark, the man came to Doe 2's motel room. Doe 2 had never seen the man before this encounter. She recalled the man was African-American, appeared young, had a tattoo on his hand, and seemed angry. When asked why she thought the man was angry, Doe 2 testified he refused to give her a hug upon entering the room, and instead immediately asked to use the bathroom, which made her "a little nervous." At the preliminary hearing, Doe 2 identified this man as defendant Williams.[7]

After a few minutes passed, the man came out of the bathroom. At some point he put money on a table. After a conversation with the man that lasted about 10 or 20 minutes, Doe 2 testified they began to argue. Using his hands, the man suddenly grabbed

---

[7]  As noted *ante*, defendant was not in the courtroom during his trial.

Doe 2 around the neck and choked her "really hard," while repeatedly asking if she wanted to "die." Doe 2 screamed for help and tried to fight back.

Although she was having trouble breathing while the man choked her, Doe 2 testified that she begged the man to stop and pleaded with him not to kill her, telling him she was only 23 years old and she had a sibling and parents. The man, however, continued to choke her. Doe 2 felt her body grow "weak," and then she "blacked out." When she regained consciousness, Doe 2 found herself "bent over on the [side of the] bed," with the man's "penis inside [her] anus." Doe 2 was certain the man was not wearing a condom.

Doe 2 testified that she again tried to fight-off the man. He, however, continued "raping" her, calling her names, and keeping his hands around her neck. At some point during the attack, Doe 2 suffered a deep cut to her right leg, as she attempted to kick the man off of her. While still on top of her, the man punched Doe 2 in the back of the head, causing her again to temporarily lose consciousness.

After the attack, the man threatened to shoot Doe 2 and told her to "shut up" as she screamed for help. He then "out of nowhere" pulled a gun and used it to strike Doe 2 "very hard" on the head. Believing he was going to kill her, Doe 2 ran to the front door, but was unable to overpower the man who had blocked the exit. She next tried to use the motel telephone to call the front desk for help. The man, however, grabbed the phone from her, and attempted to wrap the phone cord around her neck.

Because the man was preventing Doe 2 from leaving the room, she ran to the window near the bed, used her hands to "bust[]" it open, and screamed for help. Doe 2

10

saw people outside looking in her direction. The man grabbed some of his belongings, including the money he previously had placed on the table, and left. Bloodied, Doe 2 climbed out of the window, and, with the assistance of others, called friend Henry C. for help. Shortly thereafter, Henry arrived at the motel and picked up Doe 2.

After picking her up from the motel, Henry drove Doe 2 to his apartment, where she took a painkiller and showered to wash away the blood. Despite being in significant pain, Doe 2 waited about two days before seeking medical treatment. She testified she waited to go to the hospital because she believed she was "wrong" and would be in "trouble" for engaging in prostitution.

As a result of the attack, Doe 2 testified she had bruises on her neck for a couple of months, making it difficult to eat, drink, or breathe; infections and pain in her anus and rectal area; a dislocated shoulder; a "deep hole" in her face, near her temple; and multiple scars on her body, including on her right leg.

Emergency room nurse Stefanie W. was on duty on August 16 when Doe 2 came in for treatment. Doe 2 complained of neck pain and informed hospital personnel she had been "assaulted," including choked; struck "three or four times" on the head with a gun, causing her to lose consciousness; and "raped anally." Stefanie testified she observed "many bruises" on Doe 2's body. Stefanie informed Doe 2 she was a "mandatory reporter" and was required to notify police.

11

Henry testified he and Doe 2 were in a dating relationship in August 2016. At what he believed was about 6:00 or 7:00 p.m.[8] on August 14, Doe 2 called Henry and said she had just been raped. Henry, with his son in the car, drove to the motel and met Doe 2 about 10 to 20 minutes later. Henry saw Doe 2 was covered in blood, and was "hysterical." A friend or companion of Doe 2 yelled at Henry to "get her out of [t]here." As they left the motel in Henry's car, police pulled into the parking lot.

Henry drove Doe 2 to his apartment. Because she was weak, Henry helped her into and out of the shower. He observed Doe 2 had an injury to the left side of her face, near her ear. Doe 2 told Henry she could not hear out of that ear. According to Henry, the following day Doe 2 mostly cried, would not eat, and "couldn't really cope." Henry drove Doe 2 to the hospital emergency room two days after the attack.

Witness Julio C. and his wife were staying on the third floor of the motel on the night Doe 2 was attacked. Julio was outside smoking a cigarette in a third-floor stairwell when he heard from below a female's "bloodcurdling scream." A few seconds later, a young lady on the first floor looked up at Julio and said, "Did you hear that?" Julio descended one flight of stairs and met the young lady on the second floor, who appeared "panicked." Because the young lady appeared to know where the scream came from, Julio followed her as they hurried toward a second-floor room.

---

8     The record shows there was inconsistent testimony regarding the timing of the attack on Doe 2, as various law enforcement officers testified they were notified of the attack close to midnight, as discussed *post*, and contacted the suspect near the motel a short time later.

12

Once they had stopped, Julio asked the young lady what was going on inside.  She responded, "What do you mean what's going on in there?  He's beating her ass.  Get in there."  Julio looked through the window of the fully lit room and saw a naked male and female.  Julio saw the male inside the room make a movement with his hands, and, "within a second," saw the female fly "across [the] bed.  Not like someone could jump across that bed.  She flew across that bed like she had been thrown across that bed.  But she wasn't thrown.  It was—it was a strike, you know[.]"  Julio heard the male tell the female "something like, [']bitch, this ain't going to stop—you think this is going to stop me?[']"

The female stopped in front of the window where Julio and the young woman were standing.  Julio saw blood "pouring profusely" from the female's head.  Seconds later, the female started punching the window with her hands, causing it to break.  Julio and the young woman, who Julio surmised was a friend of the female, helped her escape through the window.  As the female was climbing through the window, Julio saw the male exit the room.  Once outside, the male confronted Julio, who was standing about five feet away.  With a gun at his side, the male bent his arm—as if he was going to point the gun at Julio—and said, "[o]h, bitch ass, nigga, mind your business."

According to Julio, about 20 seconds later the "butt naked" male ran off holding only the gun.  The young woman took the female back into the room and helped her quickly dress and gather her belongings, as Julio stood watch to ensure the male did not return.  Julio then walked the two women to the stairwell, where the female sat down.

13

Julio testified he told other motel guests to call 911. As he was doing so, Julio could hear the young woman and the female calling someone to pick up the female. Julio asked the female if the male with the gun was her "man." The female in response said "naw," and then added, "He tried to rape me." Julio, with the young woman's assistance, helped the female down the stairs to the ground floor, which led to the back of the motel. Less than a minute later, a white car pulled up with two men sitting in the front seat. Without saying a word, the two women got into the back seat of the car and it drove away. Julio estimated the police arrived at the motel less than 30 seconds later.

San Diego Police Officer Steven Bundy testified he was on patrol on August 16 when he was dispatched at about 7:00 p.m. to a hospital emergency room regarding a potential sexual assault that had occurred two days earlier. Officer Bundy contacted Doe 2, who initially appeared reluctant to answer any of his questions. However, as the interview progressed, she became more cooperative, explaining to the officer that she had been alone in a room at a motel located on Alvarado Canyon Road; that she had arranged to meet a man in her room and have sex with him in exchange for money; and that at some point the man, after entering her room, had pulled a gun from his pocket and attacked her. Doe 2 added the man also had choked her and cut her with an "unknown object."

During this same interview, Doe 2 told Officer Bundy the man forcibly removed her clothes, put his penis in both "her vagina and her anus," and threatened to kill her. Doe 2 also told Officer Bundy that she escaped through a motel window, as the man ran out the front door.

14

Newly retired San Diego Police Detective Rena Hernandez testified that she was assigned to the sex crimes unit in August 2016 when she began investigating the assault of Doe 2. Detective Hernandez initially met Doe 2 at about 11:30 p.m. on August 16 at a San Diego SART (i.e., Sexual Assault Response Team) office. Detective Hernandez observed multiple injuries to Doe 2's neck, face, and shoulders.

During this first interview, Doe 2 told Detective Hernandez that she had been at a motel on Alvarado Canyon Road when she had solicited a male to come to her room; that because the man wanted sex and she just wanted to talk, the man became angry, grabbed her around the neck, and said it was "her last day living" and "she was going to die"; and that she believed she lost consciousness as the man "raped" her.

Detective Hernandez testified she reinterviewed Doe 2 at police headquarters a few days later. Doe 2 provided additional details of the attack during this follow-up interview, including how the man at one point pulled out a gun and hit her with it, causing a "significant gash" to her head; how she wanted at least $300 from the man, but he had only offered $150 to $200; and how she escaped by breaking and climbing out a window. Detective Hernandez observed scratches to Doe 2's face and neck, a significant abrasion on her shoulder, and bruises and lacerations on her legs.

San Diego Police Officer Joseph Peralta was on routine patrol on August 14 when he was dispatched at about midnight[9] to the motel where Doe 2 had just been assaulted. On arrival, Officer Peralta and other officers were met by several witnesses who

---

[9] As noted *ante*, there was conflicting testimony regarding the timing of Doe 2's attack.

15

explained a female had been "screaming" inside one of the rooms. With their body-cameras operational, Officer Peralta and another officer approached the female's room, saw a shattered window and a partially removed screen. Once inside the room, they saw "blood on the walls, bed and the floor." A portion of the video from Officer Peralta's body camera was played for the jury.

California Highway Patrol Officer Mathew Cavataio testified he was on duty on August 14 and, along with other officers, was on a break at a coffee shop located about a quarter mile away from the motel. During the break, the officers received a dispatch about a potential sexual assault at the motel. The dispatcher described the suspect as a naked, or almost naked, African-American male "covered in blood."

Officer Cavataio participated in the search for the suspect. In his patrol car he drove west on Camino Del Rio North. Less than a quarter mile away, Officer Cavataio saw a male running on the sidewalk matching the suspect's description. On contact, Officer Cavataio observed the man was sweating; had blood on his chest, back, and arms; and was wearing basketball shorts with a gun "sticking out of his pocket." Officer Cavataio detained the man.

As a result of its investigation and the contact near the motel of a male matching the suspect's description, police believed defendant Williams was the man responsible for the attack on Doe 2. Detective Hernandez prepared a photographic lineup, which included a photograph of defendant; read Doe 2 the standard admonishment; and showed her the lineup. Doe 2 identified the man in photo number 2 as her attacker. That man was defendant Williams.

16

In addition to the evidence summarized *ante*, other evidence also linked defendant to the attacks on Does 1 and 2. Defendant's DNA was found on a sample taken from Doe 1's bedroom comforter.[10] Law enforcement also found Doe 1's transparent jewelry box in defendant's backpack, which he had left behind in Doe 2's motel room. Blood samples taken from defendant's handgun and chest also matched DNA from Doe 2.[11]

## DISCUSSION

### A. Absence from Trial

#### 1. *Additional Background*

At defendant's request, the court on February 7, 2018 held its first *Marsden* hearing. Defendant informed the court he wanted new counsel because he allegedly had not been informed of certain text messages made by Doe 2. During this hearing, defendant acknowledged that defense counsel had "been working real hard on [his] case" and that it "could be just miscommunication between [his] attorney and [him]." Counsel responded that he had informed defendant of the text messages, and had questioned Doe 2 about them at the preliminary hearing. The court denied defendant's request, finding his counsel was working extremely "hard" and was being "very thorough" in working the case up for trial.

---

[10]    A criminalist called by the prosecution estimated "it was 1.25 times 10 to the 26 times more likely to see the DNA evidence if Mr. Williams was a contributor to that sample than if he was not a contributor to that sample."

[11]    Another criminalist testified the "DNA results were a 3 with 27 zeroes after it times more likely if Jane Doe Number 2 was the source of that DNA than if she was not."

Defendant renewed his request for appointment of new counsel during jury selection on April 18. During this second *Marsden* hearing, defendant claimed *he* had wanted to pick at least "half" of the jury, and his counsel had dismissed a juror that defendant wanted on the panel. Defendant admitted he and his counsel were otherwise "getting along" and "not fighting each other." As defendant was explaining why he wanted new counsel, he added, "I can go pro bono. That would be fine. That would be great. Or pro per. What is it? Pro per. That's what I meant."

The record shows the court inquired of counsel, who represented he had agreed to consider defendant's "input" when selecting the jury, but as defendant's counsel it ultimately was his obligation to pick the jury. Counsel explained he dismissed this juror because the individual had a "biotech" background and had given concerning responses during voir dire regarding the validity of scientific evidence.

The court for a second time denied defendant's request. It noted counsel had "legitimate reasons" to excuse the juror because the juror had "expressed a belief . . . about the reliability of the DNA evidence and that might not be helpful [to defendant's] case." The record shows the court went on to compliment counsel regarding his manner of questioning jurors during voir dire. The court then instructed the bailiff to bring the jurors back into the courtroom.

However, before any of the jurors had entered the courtroom, the record shows defendant began questioning the court, including asking the judge how many times he had denied two *Marsden* motions. After the judge responded "[m]any times," the following colloquy took place:

"The Defendant: Well, like I stated I do not want him to represent me anymore. And I'm not going to play in this circus act anymore here. So what I'm going to do is, until I get a new attorney or like I stated, before, I'm going to go pro per.

"The Court: Are you ready to proceed, if you go pro per?

"The Defendant: If I have the right information and documents.

"The Court: No. That's not the question. Are you ready to proceed right now?

"The Defendant: No. I haven't had enough time.

"The Court: You haven't had enough time; is that correct?

"The Defendant: No. That would be impossible for me to go pro per right now.

"The Court: So could you bring in [the prosecutor]. The court reporter is ordered to seal the *Marsden* portion of this transcript . . . .

"The Defendant: Mr. So [i.e., the judge]? Like I said, I don't want him to represent me no more. I'm not going to sit in this seat no more and continue in this circus act right here. I would like to be transported back downstairs to my holding cell. If not, I'll just get up and stand by the door and wait until I can leave. I don't want to continue in these little games, little festivities anymore."

Once back in open court with the prosecutor present but outside the jury's presence, the court addressed defendant's request to proceed in propria persona and the reason it denied that request, noting for the record as follows: "We're in the middle of jury selection. [Defendant] said he's not able to proceed. So I'm finding that his request is untimely and would delay things. Therefore would be for the purpose of delay. [¶] We are going to try and continue to select the jury. I'm going to bring in the rest of the jurors.

19

We're going to select a jury. You can discuss with your attorney, if you'd like or if you'd not like how you would like to proceed with the rest of the trial."

The record shows the following discussion then took place:

"The Defendant: We can't discuss it right now? I don't want him to represent me anymore.

"The Court: I'm sorry?

"The Defendant: I understand that.

"The Court: I have 50 jurors or more that have been here on jury selection that participated for two days.

"The Defendant: Okay. And I've been coming here about 4:00 in the morning for two days going on the bus being shackled up as well.

"The Court: That's right. So what we're going to do is pick the rest of the jury. Then we'll talk with you in the morning.

"The Defendant: I'm not—you guys can pick the jury, if you like. I'm not going to be in this chair. I will be waiting by the door, or I guess I'll be . . . tased by your officers. I'm not sitting down. [¶] What I won't do is disrespect the jury when they come in here and yell things, out of . . . respect. But I'm telling you right now I'm done with this circus act here. I told you previous times that me and him have had problems, and I don't want him to represent me anymore.

"The Court: I understand. So essentially you don't want to be sitting in your seat right there; is that correct?

20

"The Defendant:  No.  I'm saying that I do not—I'm not with this whole—I don't want him to represent me no more.  *I need a new attorney.  That's how I want it.  Do I want to go pro per, no.*  I want someone that I feel I could trust has my best interest. That's what I want."  (Italics added.)

The next day, after the jury had been empaneled, a third *Marsden* hearing was held.  Defendant during this closed hearing told the court he already had stated the reasons why he wanted new counsel.  Defendant added he thought the court and his counsel were "intertwined" and in "cahoots," and claimed his counsel allegedly had pressured him to plead guilty.

After the court repeatedly asked defendant if he had any other reasons to support his request for new counsel, the following colloquy took place:

"The Defendant:  If you continue to proceed with this and dismiss my *Marsden*, I will stand up, and I won't curse in your courtroom because I'm not a disrespectful person, [but] I'm not going to play in this circus act here.  If these fine gentlemen [i.e., the bailiffs] here attack or strike me or whatever, then so be it.

"The Court:  Well, all right.  So this is what we're going to do.

"The Defendant:  That's it.  If you do not—if you dismiss my *Marsden*.  I don't wish to be defiant or disrespectful.  I'm not cursing you or violent or get at you personal, but I'm saying what is the best interest of me.  This is the third time.  Everything I say that you dismiss is all the reasons you have motives already, and you're not willing to compromise.  Him as well. [¶] This is my life here, and you guys are playing with it."

21

The record shows defendant then repeatedly interrupted the court and defense counsel, rhetorically asking if "you guys" "ever get tired of this lying?  The fakeness?  The circus act?"  The court noted for the record that defendant had taken off his tie.  The court denied defendant's third *Marsden* motion, stating if there was any discrepancy between defendant's and counsel's version of events, the court believed counsel.

At the conclusion of the *Marsden* hearing, outside the presence of the jury the court made the following observations for the record:  "Record reflect Mr. Williams has taken his tie off.  His dress shirt off and is now wearing a white T-shirt.  So, Mr. Williams, you've indicated you don't want to be here; is that correct?"

"The Defendant:  I told you I do not want to play in you guys' circus anymore. I've told you three separate times.  The first time was two months ago.  The other time was yesterday.  The other time is today.  I'm tired of doing this mouse game with you and him.  I have no problem with the DA there.  She's doing her job.  But these two here, I'm tired playing this kind of game.  Like what does someone have to do to allow you or to convince you that this is serious?  This is someone's life here and that you guys can't do this to everybody.  Someone has to get violent with you guys?  Someone has to make threats with you guys?  Someone has to die in custody to make you guys understand?"

The record shows the court again informed defendant of his right to be present, and his ability to waive that right.  Defendant exclaimed he did not want to be present at the trial, and informed the court he intended to "stand up and remain standing and speaking with [the court].  And in front of these [news] cameras—which they'll probably edit, which is fine—I know how they play as well.  In front of these jurors and everybody

22

in court, that's what I will do."  The court repeated defendant's right to be present at the trial, but warned if present, he could not disrupt the trial, including by standing up and talking, or would face removal.  Defendant then said, "Okay.  I guess I will be removed."

The court next asked for the jury to be brought into the courtroom.  Defendant responded, "Okay.  I stated what I will do.  We have an understanding."  The record shows the court again called for the jury.  As the jury entered the courtroom, the following colloquy took place:

"The Defendant:  Got to stand up now for the jurors, right?  On the record I do not want him to represent me.  This is the third time.  The first time I asked was two months ago.  The judge keeps dismissing everything I'm saying.  He's not in my best interest.  I have my reasons why.  Now they're going to take me out because I'm speaking for myself.

"The Court:  Mr. Williams, please stop.

"The Defendant:  We had a recess yesterday because I had another *Marsden*, which he dismissed again.

"The Court:  Mr. Williams, please stop.

"The Defendant:  He's not in my best interest.  I do not want you to represent me for the third time, and you know this.

"The Court:  Mr. Williams, this is the third time I'm asking you to please stop talking.

"The Defendant:  I will continue to speak because I have a mouth.  He's been trying to persuade me to plead guilty.

23

"The Court:  Bailiffs, please remove the defendant.

"The Defendant:  You guys have a good day."

In accordance with the court's directive, defendant was removed from the courtroom.

Immediately thereafter, at sidebar defense counsel moved for a mistrial, as discussed *post*, based on defendant's statements to the jury.  In denying that request, the court noted in ruling on defendant's *Marsden* motions that it already had found defense counsel had not forced defendant "to do anything"; that defendant made a "voluntary decision not to participate" and "to talk"; and that the court would instruct the jury to decide the case based only on the evidence, and "not what happens inside the court or [based on] the behavior [of defendant]."

After the sidebar while giving the jury preliminary instructions, the court addressed defendant's outburst and admonished the jury as follows:  "You must only base your decision on the evidence that is presented, not on statements that are made here, not on comments the witness makes here.  Not on actions that happened *including any actions of the defendant here.*  It's only going to be based on the evidence that's presented from the witnesses and the exhibits.  That is your task."  (Italics added.)

As shown by the record and as defendant acknowledges, the court thereafter gave him the opportunity each day of trial to participate, repeatedly informing defendant of his right to be present and to testify, or not, in his defense.  Defendant, however, remained in his holding cell throughout the trial and ultimately, at sentencing.

24

As noted, defendant claims the court erred in finding he waived under section 1043, subdivision (b) his right to be present at trial because it had not yet "commenced in his presence" for purposes of this subdivision.

2. *Governing Principles*

"A criminal defendant's right to be present at trial is protected under both the federal and state Constitutions. (U.S. Const., 6th & 14th Amends.; *United States v. Gagnon* (1985) 470 U.S. 522, 526; Cal. Const., art. I, § 15; *People v. Waidla* [(2000)] 22 Cal.4th [690,] 741.) 'The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, [citation], but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him.' (*United States v. Gagnon*, *supra*, 470 U.S. at p. 526.) Our state Constitution guarantees that '[t]he defendant in a criminal cause has the right . . . to be personally present with counsel, and to be confronted with the witnesses against the defendant.' (Cal. Const., art. I, § 15.)" (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*).)

Subdivision (a) of section 1043 provides: "Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial." However, subdivision (b) of this statute provides: "The absence of the defendant in a felony case after the trial has *commenced in his presence* shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] (1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner

25

so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.  [¶]  (2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent."  (Italics added.)

Subdivision (c) of section 1043 provides:  "Any defendant who is absent from a trial pursuant to paragraph (1) of subdivision (b) may reclaim his right to be present at the trial as soon as he is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."

Thus, under subdivision (b)(1) and (2) of section 1043, a trial may continue in a defendant's absence if it was "commenced" in his or her "presence," and if record evidence supports the finding in a removal order that the defendant engaged in "disruptive behavior" after being warned by the court; and/or, in a noncapital case, that he or she chose to be "voluntarily absent."

"While a defendant's express waiver in front of the judge might be the surest way of ascertaining the defendant's choice, it is not the only way.  A defendant's 'consent need not be explicit.  It may be implicit and turn, at least in part, on the actions of the defendant.'  (*U.S. v. Watkins* (7th Cir. 1993) 983 F.2d 1413, 1420, fn. omitted; see also *People v. Medina* [(1995)] 11 Cal.4th [694,] 739.)  In determining whether a custodial defendant who refuses to leave the lockup is 'voluntarily absent' (§ 1043, subd. (b)(2)), a trial court should take reasonable steps to ensure that being absent from trial is the defendant's choice."  (*Gutierrez*, *supra*, 29 Cal.4th at p. 1206.)

"The role of an appellate court in reviewing a finding of voluntary absence is a limited one.  Review is restricted to determining whether the finding is supported by

26

substantial evidence.  ([*People v.*] *Concepcion* [(2008)] 45 Cal.4th [77,] 84.)  [Where, as here] the record . . . supports the trial court's view that defendant was ' "aware of the processes taking place," ' that he knew ' "his right and of his obligation to be present," ' and that he had ' "no sound reason for remaining away" ' (*Taylor* [*v. United States* (1973)] 414 U.S. [17,] 19, fn. 3) . . . defendant [has] implicitly waived his right to be present.  (*Id.* at p. 20.)  No more [is] constitutionally required.  (*Smith v. Mann* (2d Cir. 1999) 173 F.3d 73, 76; *Clark v. Scott* (5th Cir. 1995) 70 F.3d 386, 389–390.)"  (*People v. Espinoza* (2016) 1 Cal.5th 61, 74 (*Espinoza*).)

Our analysis of this issue is guided by our high court's decision in *People v. Johnson* (2018) 6 Cal.5th 541 (*Johnson*).  The defendant in *Johnson* had a long history of disruptive behavior during judicial proceedings and a "fraught relationship" with his attorney, Steven Hauser.  (*Id.* at p. 553.)  The defendant in *Johnson* wanted to represent himself in his first degree murder trial, and refused to attend multiple pretrial hearings " 'if Mr. Hauser [was] his attorney.' "  (*Ibid.*)

After the first trial ended in a deadlock, the parties in *Johnson* convened for a status conference.  During that hearing, the defendant twice spat on his attorney and interrupted the court, making among others, comments such as, " 'Fuck you and the staff. Fuck you and suck my dick.' "  (*Johnson*, *supra*, 6 Cal.5th at p. 553.)  On August 25, 1998, when the parties convened to discuss the juror questionnaire, the defendant "reiterated his lack of faith in Hauser and claimed to be looking for private counsel.  Jury selection was scheduled to begin on September 17, 1998."  (*Id.* at p. 554.)

27

"Hauser was still representing defendant at the proceedings on September 17, 1998, which began in the courtroom. The plan was for everyone to go down to the jury assembly room, where the court would introduce the parties to the 400 prospective jurors, provide a time estimate and hand out hardship questionnaires, and then proceed to a full introduction of the case and distribution of the general questionnaires. After Hauser objected to the bailiff's plan to place defendant in leg chains, [the court] ruled that defendant and codefendant would instead wear stun belts.

"In the jury room shortly thereafter, as the clerk was asking the prospective jurors to rise and be sworn, defendant suddenly and violently attacked Hauser, striking him on the head. Defendant exclaimed, 'That mother fucker. I don't want him. Mother fucker. Fucking ho (sic).' Deputy sheriffs rushed to restrain defendant, and [another deputy] instructed him to sit down. The stun belt was activated twice, but it had little or no effect. Defendant refused to cooperate, and it 'took any number of deputy sheriffs to attempt to subdue him.' Defendant complained, 'Mother-fucker. Tried to dump me in trial. [¶] I don't want you. I do not want this man. He do not represent my interest, ladies and gentlemen. I'm qualified to represent myself. This man has intentionally dumped me in trial.' The court adjourned, but defendant interjected, 'They do a lot of illegal shit in these courtrooms' and attacked Hauser a second time. A deputy suffered a finger injury in the melee. Hauser suffered visible facial injuries and swelling. Afterwards, defendant bragged to the bailiff that he would attack Hauser again if given the opportunity." (*Johnson*, *supra*, 6 Cal.5th at p. 554.)

28

The trial court in *Johnson* dismissed the venire, finding the unprovoked attack prevented prospective jurors from being fair. (*Johnson*, *supra*, 6 Cal.5th at p. 555.) A few days after the unprovoked attack, defendant informed the court he did not want to listen to the trial proceedings over a loudspeaker in his cell, after the court had refused to allow the defendant back into the courtroom as a result of his " 'offensive, violent and outrageous conduct.' " (*Ibid.*) The court also ordered daily transcripts of the trial be made available to defendant.

The court in *Johnson* instructed the new venire that the defendant would " 'not be present for these proceedings. The court is instructing . . . that you are not to speculate as to the reasons for his absence, nor is this a matter which in any way can affect you or your verdict in this case.' " (*Johnson*, *supra*, 6 Cal.5th at p. 555.) Over the course of the trial, the defendant declined to listen to the proceedings, and refused to talk to Hauser, who sought to communicate with his client almost every day. At one point a bailiff overheard the defendant tell Hauser he "should have taken the opportunity 'to slit [his] own throat' in front of the 400 prospective jurors." (*Id.* at p. 556.) After the jury found defendant guilty of first degree murder with special circumstances, the defendant continued to refuse to participate in proceedings, including during the penalty phase.

Much like defendant Williams in the instant case, the defendant in *Johnson* argued that the trial court's removal order was invalid because the court had "overstepped its bounds by barring him before his trial had even begun." (*Johnson*, *supra*, 6 Cal.5th at p. 562.) The *Johnson* court analyzed this issue as follows: "[The defendant] relies on section 1043, subdivision (b), which creates an exception to the requirement that a

29

defendant be personally present at the trial only 'after the trial has commenced in his presence.' (Cf. *Smith v. Mann* (2d Cir. 1999) 173 F.3d 73, 76 ['nothing in the Constitution prohibits a trial from being commenced in the defendant's absence so long as the defendant knowingly and voluntarily waives his right to be present'].) He then points to dicta in *People v. Concepcion*, *supra*, 45 Cal.4th 77, 80, footnote 4, where we observed in passing that commencement of trial under section 1043 begins at least as early as jury selection. Defendant reasons that because jury selection did not begin until November 5, 1998, the trial court acted prematurely when it barred him from the trial.

"Defendant misunderstands the timeline. The parties convened in the jury assembly room for jury selection on September 17, 1998. The court would have proceeded to consider hardships and pass out the general questionnaires, but was disrupted by defendant's attack on Hauser. When the court discovered that the prospective jurors were irrevocably tainted by defendant's misconduct, it dismissed the venire. [Citations.] Because it would take at least three weeks to assemble another panel of 400 prospective jurors and the prosecutor declared a scheduling conflict thereafter, the trial court found good cause to continue the trial until November. Consequently, the proceedings on November 5, 1998, were merely a continuation of the trial that had begun, for purposes of section 1043, on September 17, 1998. (See *People v. Granderson* (1998) 67 Cal.App.4th 703, 707.) In any event, the evident purpose of section 1043's requirement that trial has commenced in the defendant's presence is to ensure that the defendant is aware of the right to be present and that the trial will continue in the defendant's absence. (See *People v. Ruiz* (2001) 92 Cal.App.4th 162, 168 [(*Ruiz*)];

30

accord, *Taylor v. United States* (1973) 414 U.S. 17, 20.)  The record shows that defendant was assuredly aware of these things."  (*Johnson*, *supra*, 6 Cal.5th at pp. 562–563.)[12]

3.  *Analysis*

Applying, as we must, *Johnson*'s interpretation of subdivision (b) of section 1043 here, we conclude that defendant's trial had "commenced in his presence" for purposes of this statute *before* he was removed for "disruptive behavior" on April 19, 2018.  The record shows the jury already had been empaneled, and was filing into the courtroom to receive preliminary instruction and hear the parties' opening statements, when defendant made the outburst.

---

[12]    See *People v. Lewis* (1983) 144 Cal.App.3d 267, 279 (*Lewis*) [concluding a defendant was present when his trial "commenced" for purposes of subdivision (b) of section 1043 because he was physically present in the courtroom where the trial was to be held, understood the proceedings against him were underway, and confronted the judge and voluntarily stated he did not desire to participate any further in those proceedings]; but see *People v. Molina* (1976) 55 Cal.App.3d 173, 177 (*Molina*) [finding the court erred in proceeding with a *noncustodial* defendant's trial because, although he was present for the venire, he disappeared before the jury was sworn or any evidence was introduced, and thus was not present when the trial commenced for purposes of subdivision (b) of section 1043].)  In light of *Johnson*, we have serious doubts whether *Molina* and its interpretation of subdivision (b) of 1043 is still "good law."  In any event, since being decided in 1976, other courts interpreting this statute have consistently refused to follow *Molina*, as do we.  (See e.g., *Ruiz*, *supra*, 92 Cal.App.4th at pp. 168–169 [refusing to follow *Molina* because "[n]o legitimate objective is served by requiring the waiver of one's presence to occur only after the potential jurors have been sworn for voir dire, the jury is impaneled or the first witness is sworn"]; *Lewis*, *supra*, 144 Cal.App.3d at p. 279 [refusing to follow *Molina* because the "only function" of the presence-at-commencement requirement in subdivision (b) of section 1043 is to "insure the defendant really makes a voluntary and knowing waiver of his right to be present at the trial proceedings"].)

31

Quite simply, if a trial "commenced" in a defendant's "presence" for purposes of subdivision (b) of section 1043 when the parties merely "convene[] in the jury assembly room" to *begin* jury selection, as found by our high court in *Johnson* (6 Cal.5th at p. 563), then most assuredly defendant's trial in the instant case had "commenced" under this statute after the jury was empaneled and after the court had denied his third *Marsden* motion. At that point, defendant "assuredly" was aware of the "right to be present [at trial] and that the trial [would] continue in [his] absence." (See *ibid.*) We thus independently conclude the court did not violate subdivision (b) of section 1043 when it continued the trial on April 19, after defendant was removed from the courtroom.

Moreover, substantial record evidence supports a finding that, following the denial of his third *Marsden* motion, defendant on April 19 engaged in "disruptive behavior" for purposes of subdivision (b)(1) of section 1043—a finding he wisely does not challenge on appeal. In any event, as summarized *ante*, the record shows the court repeatedly warned defendant during that hearing that, if he made good on his repeated threats to stand up during the proceedings and, among other behaviors, address the jury, he would be removed from the courtroom.

Moreover, the record shows that despite such warnings, when the jury returned to the courtroom, defendant followed through on these threats, as the court patiently told defendant to "please stop," finally asking the bailiffs to remove defendant. Because substantial evidence supports the finding defendant engaged in "disruptive behavior" under subdivision (b)(1) of section 1043, the court on April 19 had the statutory authority

32

to remove defendant from the courtroom and continue the trial in his absence. (See

*Espinoza*, *supra*, 1 Cal.5th at p. 74.)

The record evidence also supports the finding that defendant, for the balance of the trial, was "voluntarily absent" for purposes of subdivision (b)(2) of section 1043, as he was not being prosecuted for an offense "punishable by death." (See § 1043, subd. (b)(2).) Indeed, the record shows that each day of trial, the court offered defendant the opportunity to return to the courtroom and be present; that defendant steadfastly refused to leave his holding cell; and thus, that defendant voluntarily absented himself from the proceedings. (See *Espinoza*, *supra*, 1 Cal.5th at p. 74.) We therefore conclude the court was statutorily authorized under 1043 subdivision (b)(1) and (2) to continue defendant's trial in his absence.[13]

B. "Request" to Self-Represent

As summarized *ante*, in the middle of jury selection the court held a second *Marsden* hearing, after defendant's counsel excused a juror that defendant had wanted on the panel. As also noted *ante*, it was during this *Marsden* hearing that defendant for the first time raised the prospect of self-representation, which the court denied as untimely.

---

[13] We note defendant in passing also claims the court separately erred in failing to obtain a written waiver of his right to be personally present at the trial. (See e.g., § 977 [requiring written waiver of defendant's right to be personally present during felony trial proceedings]. We reject this claim of error, as section 977 must be considered in light of section 1043, subdivision (b), which provides a *separate* statutory basis for a court to proceed with a defendant's trial in the defendant's absence. (See e.g., *People v. Bell* (2019) 7 Cal.5th 70, 115 [interpreting sections 977 and 1043 together in analyzing when a capital defendant may be absent from the courtroom].)

1. *Guiding principles*

In *Faretta v. California* (1975) 422 U.S. 806, 835–836 (*Faretta*), the "United States Supreme Court made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. [Citation.] A trial court must grant a defendant's request for self-representation if the request is timely and unequivocal, and the defendant makes his request voluntarily, knowingly, and intelligently." (*People v. Johnson* (2019) 8 Cal.5th 475, 499.)

The Sixth Amendment right to self-representation articulated in *Faretta* is not absolute, however. (*People v. Butler* (2009) 47 Cal.4th 814, 825.) "Unlike the right to representation by counsel, the ' "right of self-representation is waived *unless defendants* articulately and unmistakably demand to proceed *pro se*." ' " (*People v. Danks* (2004) 32 Cal.4th 269, 295; see *People v. Doolin* (2009) 45 Cal.4th 390, 453 [noting whether a request to self-represent is "timely or untimely," such a request "must be unequivocal"].)

In order to protect the fundamental constitutional right to the effective assistance of counsel, "one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself." (*People v. Marshall* (1997) 15 Cal.4th 1, 23 (*Marshall*).) "In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo." (*People v. Dent* (2003) 30 Cal.4th 213, 218 (*Dent*).)

In so doing, "courts must draw every inference against supposing that the defendant wishes to waive the right to counsel." (*Marshall*, *supra*, 15 Cal.4th at p. 23.) Courts "should evaluate not only whether the defendant has stated the motion clearly, but

34

also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay" may be denied without running afoul of the constitution. (*Ibid.*)

2. *Analysis*

Turning to the instant case, as summarized *ante* the record shows that defendant did not make a clear and unequivocal request to represent himself at trial. (See *Marshall*, *supra*, 15 Cal.4th at p. 23.) To the contrary, the record shows that during the second *Marsden* hearing, defendant stated he wanted to self-represent only until new counsel was appointed to his case.

In addition, immediately after the conclusion of this hearing, defendant outside the presence of the jury stated he did *not* want to represent himself at trial, again reiterating he would do so only until the court appointed him new counsel: "I'm saying that . . . I don't want him to represent me no more. *I need a new attorney.* That's how I want it. *Do I want to go pro per, no.* I want someone that I feel I could trust has my best interest. That's what I want." (Italics added.)

Because the record supports the finding defendant was ambivalent about self-representation, and his "request" to do so was only based on his desire to obtain new defense counsel, we independently conclude the court properly denied his *Faretta* motion. (See *Marshall*, *supra*, 15 Cal.4th at p. 23; *Dent*, *supra*, 30 Cal.4th at p. 218; see

35

also *People v. Tena* (2007) 156 Cal.App.4th 598, 608 [concluding the defendant's remarks about self-representation after denial of his *Marsden* request were "impulsive reactions" to "frustrated attempts to secure an attorney who would subpoena the witnesses that he desired, rather than unequivocal *Faretta* requests"]; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205, fn. 3 [concluding the defendant's request to self-represent was equivocal where, after denial of his *Marsden* request, defendant asked to proceed in propria persona].)

In addition, we separately conclude that granting defendant's self-representation "request" under the circumstances presented in this case would have "unjustifiably delay[ed]" his trial and "obstruct[ed] the orderly administration of justice." (See *People v. Burton* (1989) 48 Cal.3d 843, 852–853 (*Burton*). Such a determination typically is based on such factors as the " 'quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a [request].' " (*Ibid.*)

Here, the record shows the first time defendant made his "request" to self-represent was *after* his trial had commenced, when the parties were in the middle of jury selection. (See *Johnson*, *supra*, 6 Cal.5th at pp. 562–563.) The record also shows that, during the first *Marsden* hearing held in February 2018, defendant admitted his counsel had been "working real hard" on his case and his concerns about their relationship may have been "just miscommunication." Significant to the instant issue, defendant in the February hearing did *not* make a motion or request under *Faretta* to self-represent,

36

despite the fact his trial was then more than two *months* away. (See *People v. Johnson*, *supra*, 8 Cal.5th at p. 499 [noting that "[i]f a self-representation motion is untimely, . . . it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed pro se' [citation]"].)

Finally, we note at defendant's sentencing, the court complimented defense counsel for his representation of defendant, particularly because defendant had been absent for the duration of the trial, stating: "First, I want for the record to address the performance of Mr. Williams' defense lawyer, because I'm sure this will be an issue on appeal. I find that he has performed in an exemplary manner. His performance has been extremely professional, and it's very difficult in a case like this for an advocate to attempt to persuade a jury of the defendant's innocence when the facts are stacked against him, and Mr. [Thomas] Bahr has performed admirably. By the jury's verdict, you can tell they thought about what he said and the defense that he put forward, and I'm not sure how much better any defense attorney could have done, and I wanted to put that on the record because I know earlier Mr. Williams had made several comments about his inability—or his lack of confidence, I would say, in his defense lawyer, and I think those are totally unfounded." (See *Burton*, *supra*, 48 Cal.3d at p. 853 [recognizing a trial court should consider among other factors the " 'quality of counsel's representation of the defendant' " in ruling on a self-representation request].)

For these reasons, we independently conclude the court properly denied defendant's equivocal request to self-represent after the commencement of his trial.

C.  Mistrial Motion

1. *Additional Background*

Defendant claims the court erred in denying his counsel's request for a mistrial made at sidebar immediately after defendant had been removed in front of the jury.  As summarized *ante*, the court denied that oral motion, finding counsel had not forced defendant "to do anything," much less plead guilty, as defendant had exclaimed as he was being escorted out of the courtroom.  As also noted *ante*, the court promptly admonished the jury that it was not to consider defendant's courtroom "comments" or "actions" in deciding guilt or innocence, as that determination was "only going to be based on the evidence that's presented from the witnesses and the exhibits."

Moreover, the record shows as the trial proceeded, a juror sent the court a note asking, "Could you explain legality of having def. present?  And his ability to make statements, etc.[?]"  The court informed counsel of its receipt of the note and, outside the jury's presence, they discussed a proposed response.

After a break in the proceedings, the court then suggested it give the following proposed response to the note:  " 'Defendant has a constitutional right to be present at his trial.  He may also decline to be present.  Do not consider for any reason at all the fact that the defendant is not present during the trial.'

"Now, the question also is, his ability to make statements.  I think that implicates his Fifth Amendment right. [¶] At some point I think we're going to have to instruct him that he has the right to testify.  He also has the right not to testify.  And then read the

38

instruction about 355, 'Do not consider for any reason at all the fact a defendant did not testify. In fact, that's not evidence.'

"That's my contemplated. For today's purposes, I was just going to say, 'A defendant has a constitutional right to be present at his trial. He may also decline to be present. Do not consider for any reason at all the fact the defendant is not present during the trial.' [¶] And I was going to say, 'You are to decide this case based only on the evidence received in the trial, and the testimony from the witnesses on the witness stand.' "

The record shows that defense counsel responded, "That's exactly right"; and that the prosecutor also was in agreement with the court's proposed response. Once the jury was seated, the court read the juror's note, and then instructed the jury as follows: "The defendant has a constitutional right to be present at his trial. He may also decline to be present. Do not consider for any reason at all the fact that the defendant is not present during the trial.

"You are to decide this case based only on the facts and evidence presented during the trial. That means testimony from the witnesses who have taken an oath and are on the witness stand, or evidence that is admitted, exhibits that have been admitted into evidence. That is your task. [¶] So you are not to consider for any reason at all the fact the defendant is not present during the trial."

After presentation of the evidence, the court during final jury instructions read the following modified version of CALCRIM No. 204: "The fact that the defendant was not present during some of these proceedings is not evidence. Do not speculate about the

39

reason.  You must completely disregard this circumstance in deciding the issues in this case.  Do not consider it for any purpose or discuss it during your deliberations."

2. *Guiding Principles and Analysis*

" '[A] motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " '  (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)  'We review a ruling on a mistrial motion for an abuse of discretion. [Citations.]  A trial court should declare a mistrial only "if the court is apprised of prejudice that it judges incurable by admonition or instruction." '  [Citations.]  'In making this assessment of incurable prejudice, a trial court has considerable discretion." ' (*People v. Lewis* (2008) 43 Cal.4th 415, 501.)"  (*People v. Bell*, *supra*, 7 Cal.5th at p. 121.)[14]

Our high court's decision in *People v. Lucero* (1988) 44 Cal.3d 1006 (*Lucero*) informs our analysis on this issue.  There, our high court found the trial court's prompt admonition to the jury cured the courtroom misconduct of the mother of one of two murder victims.  During closing, defense counsel in *Lucero* had argued the murders were not premeditated, relying in part on the absence of evidence of any screaming or other sounds by the victims.  Immediately thereafter, while seated in the courtroom the mother

---

14    Defendant argues we should review de novo the court's denial of his mistrial motion.  However, as recently noted by our high court in *Bell*, we apply an abuse of discretion standard in reviewing the denial of such a motion.  (See *People v. Bell*, *supra*, 7 Cal.5th at p. 121; see also *People v. Wallace* (2008) 44 Cal.4th 1032, 1068 [recognizing that " '[w]hether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions' "].)

repeatedly screamed in front of the jury that the noise from a ballpark near the murder scene prevented anyone from hearing the victims' voices. (*Id.* at pp. 1021–1022.) Although the mother was escorted out of the courtroom, the *Lucero* court noted the mother's screaming was still audible in the courtroom. The trial court admonished the jury to disregard the mother's outburst and, outside the jury's presence, denied the defendant's motion for a mistrial. (*Ibid.*)

On appeal, the defendant in *Lucero* argued the court erred in denying his mistrial motion because the mother's outburst "came at the worst possible time in terms of its prejudicial impact—just as the jury was preparing to leave the courtroom to begin deliberating his guilt." (*Lucero*, *supra*, 44 Cal.3d at p. 1022.) The defendant also argued that the "prejudicial impact was compounded by the fact that the outburst was not simply a display of emotion, but may have informed the jury of facts outside of the record, imparted facts outside the record" (*id.* at pp. 1022–1023); and that the prejudice was even more acute because the outburst occurred in a capital case. (*Id.* at p. 1023.)

In rejecting each of these arguments, the *Lucero* court recognized the mother's outburst was "isolated" and "was followed by a prompt admonition" to the jury. (*Lucero*, *supra*, 44 Cal.3d at p. 1024.) Because a trial court is afforded "broad discretion" in ruling on a mistrial motion (*ibid.*), the *Lucero* court concluded the trial court had not abused its discretion in denying the defendant's mistrial motion. (*Ibid.*)

Although the "outburst" in *Lucero* involved courtroom misconduct by a spectator, the facts there are not unlike those in the instant case. In both cases the outburst or disruptive courtroom behavior was fleeting and "isolated" (see *Lucero*, *supra*, 44 Cal.3d

41

at p. 1024); and in both cases the trial court promptly admonished the jury not to consider such misconduct in determining guilt or innocence.

Moreover, because defendant himself engaged in the disruptive behavior, after repeatedly threatening to do so unless the court agreed to his demand for new counsel, he cannot now complain on appeal about any possible error or prejudice he himself invited. (See e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1054 [rejecting claim of juror misconduct for purposes of mistrial motion because it was the defendant who initiated telephone contact with two jurors after the guilt, but before the penalty, phase of his trial, and noting " '[a]s a matter of policy, a defendant is not permitted to profit from his own misconduct' "]; *People v. Williams* (1988) 44 Cal.3d 1127, 1154–1155 [rejecting the defendant's claim the court consider declaring a mistrial because the jury *may* have considered extraneous evidence in the penalty phase of his case, noting to the extent the jury did consider such evidence, it was the direct result of the defendant's own misconduct when he told some of the jurors he was " 'going to get each and every one of you mother fuckers' " after the jury returned a guilty verdict]; *People v. Gomez* (1953) 41 Cal.2d 150, 162 [applying doctrine of invited error to reject a defendant's mistrial motion after the defendant, during voir dire, attempted to escape, leading the bailiff to draw his weapon and an unidentified woman to exclaim loudly in front of some of the jurors, " 'I knew he was going to do it all the time' "].)

Nor can he complain he did not receive a fair trial as a result of *his* voluntary and knowing decision to absent himself for the remainder of the trial after he was removed for engaging in disruptive behavior.

42

Finally, defendant points to no record evidence suggesting the jury did not follow the court's instructions, including when the court admonished the jury shortly after defendant's outburst that it was to decide guilt or innocence based only on the evidence and *not* on defendant's comments or actions; when, in response to a juror's note, it admonished the jury it was not to consider defendant's absence for "any reason at all"; and finally, when instructing the jury with a modified version of CALCRIM No. 204, that it was not to speculate regarding why defendant had not been present, and to "completely disregard" that circumstance in deciding guilt or innocence. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [noting the "presumption that jurors understand and follow instructions [is] '[t]he crucial assumption underlying our constitutional system of trial by jury' "]; *People v. Sanchez* (2001) 26 Cal.4th 834, 852 [noting "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].) For these reasons, we conclude the court properly exercised its discretion in denying the oral mistrial motion made by defendant's counsel.

D. Mental Health Diversion

The Legislature in June 2018 established a diversion program for individuals diagnosed with qualifying mental health disorders. (§ 1001.36, subd. (a); Stats. 2018, ch. 34 (Assem. Bill No. 1810), § 24, eff. June 27, 2018.) A few months later, the Legislature amended the diversion scheme to eliminate eligibility for defendants convicted of, as relevant here, an offense requiring registration under section 290, and/or rape.

(§ 1001.36, subd. (b)(2)(B) & (C), respectively; Stats. 2018, ch. 1005 (Sen. Bill No. 215), § 1, eff. Jan. 2019.)[15]

As noted *ante*, defendant was required to register under section 290, and was convicted of two counts of forcible rape (i.e., counts 3 & 6.)  As defendant therefore recognizes, he is statutorily ineligible for diversion under *amended* section 1001.36.

Defendant nonetheless claims his cause should be remanded to allow the court to determine whether he qualifies for diversion under section 1001.36 as *originally* enacted and made effective on June 27, 2018, a few months after his sentencing.  Specifically, he claims that applying amended section 1001.36 to him violates ex post facto and due process protections under the federal and state Constitutions.  We disagree.

The federal and state ex post facto clauses (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9) prohibit legislation " 'which makes more burdensome the punishment for a crime, after its commission.' "  (*Collins v. Youngblood* (1990) 497 U.S. 37, 42; *People v. McVickers* (1992) 4 Cal.4th 81, 84.)  The ex post facto prohibition is intended to ensure that individuals have " 'fair warning' about the effect of criminal statutes [and] 'restricts governmental power by restraining arbitrary and potentially vindictive legislation.' "  (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 267.)

Here, ex post facto concerns do not apply because, when defendant committed his crimes in August 2016, he could not have relied on the possibility of receiving pretrial

---

15    The Legislature made nonsubstantive amendments to section 1001.36 effective January 1, 2020.  (See Stats. 2019, ch. 497 (Assem. Bill No. 991), § 203, eff. Jan. 1, 2020.)

44

mental health diversion as this law had yet been passed. Moreover, the Legislature's amendment of section 1001.36 to eliminate eligibility for defendants required to register under section 290 and/or those charged with rape did not make an act unlawful that was not formerly unlawful, nor did it increase the punishment for the offenses with which defendant was charged. (See *People v. White* (2017) 2 Cal.5th 349, 360.)

That is, defendant was subject to the same punishment when he committed his offenses as he was after the Legislature narrowed the scope of defendants eligible for diversion. Thus, we conclude amended section 1001.36 does not violate the ex post facto clauses of the federal or state Constitutions. (Accord, *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1054, rev. granted Aug. 14, 2019, No. S256113 [concluding that, because all relevant legislative activity occurred years after the defendant committed his offenses, he could not have relied on the prospect of receiving diversion when he committed those offenses, and therefore, that the amendment to section 1001.36 eliminating eligibility for sex offenders like the defendant was not an ex post facto law].)

E. No Equal Protection Violation

Defendant next claims the carve-out to section 3051 violates the equal protection clause because, as a one-strike offender, he is statutory ineligible for a youth offender parole hearing while a murderer is entitled to such a hearing.

45

1. *Youth Offender Parole Hearings*

Enacted in 2013, the Legislature intended in section 3051 et seq. to " 'establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity . . . .' " (*In re Trejo* (2017) 10 Cal.App.5th 972, 980 (*Trejo*).)  Section 3051 therefore provides for youth offender parole hearings that guarantee youth offenders a meaningful opportunity for release on parole.  (§ 3051, subd. (e).)  Youth offenders who committed their "controlling offense" prior to reaching a specified age are entitled to a parole hearing after serving a designated period in custody.  (§ 3051, subd. (b).)  A "controlling offense" is defined as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."  (§ 3051, subd. (a)(2)(B).)

As originally enacted, section 3051 applied where the controlling offense was committed before the offender was 18 years old.  (*Trejo*, *supra*, 10 Cal.App.5th at p. 981 & fn. 6.)  By amendment effective January 1, 2016, the Legislature extended the availability of youth offender parole hearings to offenders who were under 23 years old when they committed their controlling offenses.  (Stats. 2015, ch. 471 (Sen. Bill No. 261), § 1, eff. Jan. 1, 2016; see *Trejo*, at p. 981 & fn. 6.)  By subsequent amendments and as relevant here, the Legislature further extended the availability of youth offender parole hearings to offenders who were 25 years old or younger when they committed their controlling offenses.  (Stats. 2017, ch. 684 (Sen. Bill No. 394), § 3051, eff. Jan. 1, 2018.)

The version of section 3051[16] applicable when defendant committed the offenses in August 2016 included various exceptions from the statutory scheme. Former subdivision (h) of section 3051 provided in part: "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, *or Section 667.61*, or in which an individual was sentenced to life in prison without the possibility of parole." (Italics added.)[17] Although defendant was 24 years old when he committed the offenses against Doe 1, he is statutory ineligible for a youth offender parole hearing because he was sentenced as a one-strike offender (see §§ 3051, subd. (h) & 667.61, subds. (a), (c) & (d)) on counts 3, 4, 5, and 6.

2. *Equal Protection Principles and One-Strike Offenders*

Both the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee to all persons the equal protection of the laws. In order to succeed on his equal-protection claim, defendant initially must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (See *People v. Wilkinson* (2004) 33 Cal.4th 821, 836

---

16    We note this version limited youth offender parole hearings to any prisoner who was under "23 years of age" at the time he or she committed the controlling offense. (See former § 3051, subd. (a)(1).) However, as noted the Legislature subsequently amended section 3051 to apply to a prisoner "who was 25 years or younger" at the time he or she committed the controlling offense. (§ 3051, subd. (a)(1).)

17    Current subdivision (h) of section 3051 provides in relevant part: "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, *or Section 667.61*, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." (Italics added.)

47

(*Wilkinson*).) For purposes of our analysis, we will assume defendant has made such a showing.

Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 882.) "[E]qual protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).) "This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.' " (*Id.* at pp. 74–75.) To mount a successful rational basis challenge, a party such as defendant here must " 'negative every conceivable basis' " that might support the disputed statutory disparity. (*Heller v. Doe* (1993) 509 U.S. 312, 320 (*Heller*).) If a plausible basis exists for the disparity, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*Turnage*, at p. 74.)

In *People v. Edwards* (2019) 34 Cal.App.5th 183 (*Edwards*), on which defendant relies, the First District addressed equal protection and the application of section 3051 to one-strike offenders sentenced pursuant to section 667.61. The *Edwards* court concluded

48

equal protection required one-strike offenders be afforded a youth offender parole hearing under section 3051, finding "unconstitutional" the carve-out of such offenders in subdivision (h) of that statute.  (*Edwards*, at p. 197.)  In reaching its conclusion, the *Edwards* court found "no rational relationship between the disparity of treatment [of one-strike offenders] and a legitimate governmental purpose" (*ibid.*), noting that section 3051 included "first degree murderers but exclude[d] One Strikers."  (*Edwards*, at p. 195.)

The *Edwards* court in its decision relied heavily on *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*).  In *Contreras*, our high court held the Eighth Amendment's ban on cruel and unusual punishment was violated by the imposition of sentences of 50 years to life, and 58 years to life, on two 16-year-old nonhomicide offenders.  (*Contreras*, at p. 356.)  In support of its holding, *Contreras* in turn relied on United States Supreme Court authority including *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), and *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*).  From such authority, *Contreras* recognized that the Eighth Amendment "impose[d] unique constraints on the sentencing of juveniles who commit serious crimes" (*Contreras*, at p. 359); and that children therefore " 'are constitutionally different from adults for purposes of sentencing.' " (*Ibid.*, quoting *Miller*, at p. 471.)

Our high court in *Contreras* in particular relied on the Supreme Court's *Graham* decision, a case involving a 17-year-old defendant who was sentenced in Florida to life without possibility of parole (LWOP) for a nonhomicide offense, in discussing the sentencing differences between juvenile and adult offenders:  "Central to the high court's analysis was its 'consideration of the culpability of the [juvenile] offenders at issue in

49

light of their crimes and characteristics, along with the severity of the punishment in question.' (*Graham*, *supra*, 560 U.S. at p. 67.) As for culpability, the high court reiterated its observations in *Roper* that '[a]s compared to adults, juveniles have a " 'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." [Citation.] These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." ' (*Graham*, at p. 68, quoting *Roper*, *supra*, 543 U.S. at pp. 569–570, 573.)" (*Contreras*, 4 Cal.5th at pp. 365–366.)

Unlike the *Edwards* court, the Second District in *People v. Bell* (2016) 3 Cal.App.5th 865 (*Bell*)[18] rejected a one-strike offender's equal protection challenge to the carve-out in section 3051. In *Bell*, the juvenile defendant argued that equal protection principles mandated that he receive a youth offender parole hearing under section 3051, despite being sentenced under the one-strike law for his commission of "multiple violent crimes of a horrific and devastating nature." (*Bell*, at p. 876.) The *Bell* defendant was 14 years old, as noted, when he "broke into the victim's home in order to commit rape, raped

---

18     Reviewed granted on other grounds on January 11, 2017, S238339, vacated, and transferred on June 13, 2018 in light of *Contreras*. Noting this was the most recent of six appeals it had decided following the defendant's convictions for crimes he committed in 2000 when he was 14 years old, the Second District in *People v. Bell* (Aug. 2, 2018) 2018 WL 3655658 remanded the matter for the trial court to consider and apply the "*Contreras* factors" in resentencing the defendant. (*Id.*, at p. *1.)

and robbed her at gunpoint in front of her eight-year-old son, and tried to kidnap her in order to facilitate his crimes."  (*Ibid.*)

The defendant in *Bell* argued there was no rational basis for the Legislature to treat him "more severely" than a juvenile who commits the "far more serious crime of special circumstances murder."  (*Bell*, *supra*, 3 Cal.App.5th at p. 878.)  In response, the People in *Bell* argued that the defendant's commission of "multiple offenses, including rape, burglary with the intent to commit rape, and assault with a firearm" provided a rational basis for the Legislature to exclude one-strike offenders from the mandatory minimum parole eligibility requirements of section 3051.  (*Id.* at pp. 878–879.)  The People in *Bell* further argued that the risk of recidivism was yet another reason for the Legislature to exclude one-strike offenders.  (*Id.* at p. 879.)  The *Bell* court agreed with the People, concluding the "threat of recidivism gives rise to a rational basis for the Legislature's decision to exclude one-strike offenders from section 3051.  (*Ibid*.)

In support of its decision, the *Bell* court reasoned as follows:  "We begin by noting that Three Strikes offenders were also excluded from section 3051.  Because the Three Strikes law is geared toward repeat offenders [see § 667, subds. (b) to (i), inclusive], we believe the statutory scheme suggests that the Legislature had recidivism in mind when it excluded one-strike offenders.

"We also find persuasive that the Legislature has enacted several comprehensive statutory schemes that all seem to focus on the Legislature's concerns over recidivism by those who commit violent sex offenses. The Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.) provides for the indefinite civil commitment of certain

51

offenders who are found to suffer from a qualifying mental disorder after the completion of their prison terms. The Mentally Disordered Offenders Act (Pen. Code, § 2690, et seq.) permits the continued detention of certain other sex offenders until they receive appropriate mental health treatment that results in remission of their disorder. Each has the same purpose: to protect the public from a select group of sexual offenders who are extremely dangerous and to provide treatment for them. [Citations.]

"Section 290 requires the lifetime registration of a large class of sex offenders, including those who commit assault or kidnapping with the intent to commit rape. (§ 290, subd. (c).) The purpose of section 290's lifetime registration requirement is to ensure that persons convicted of the enumerated crimes be readily available for police surveillance at all times because the Legislature has deemed them likely to commit similar offenses in the future. [Citation.]

"As we see it, the Legislature believes that most sex offenders pose a recidivism risk. We believe the Legislature had that concern in mind when it excluded one-strike offenders such as Bell from the reach of section 3051, and that the risk of recidivism provides a rational basis for doing so. [¶] Based on this, and given the deferential standard we must apply, we cannot say that the Legislature lacked a rational basis for its sentencing choice." (*Bell*, *supra*, 3 Cal.App.5th at pp. 879–880.)

3. *Analysis*

We agree with the *Edwards* and *Bell* courts that a rational basis test applies in determining whether the carve-out for one-strike offenders in section 3051, subdivision (h) is unconstitutional under equal protection principles. However, our agreement with

*Edwards* ends there, as we disagree there is no " 'conceivable basis' " supporting the disputed statutory disparity for such offenders, as compared to murderers. (See *Heller*, *supra*, 509 U.S. at p. 320; see also *Turnage*, *supra*, 55 Cal.4th at p. 74 [noting if a plausible basis exists for the disparity, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law"].)

For one thing, we find *Edwards*' reliance on *Contreras* misplaced for two reasons. First, *Contreras* involved a constitutional challenge to LWOP sentences under the Eighth Amendment's prohibition of cruel and unusual punishment. *Contreras* did not analyze whether such sentences violated the equal protection clause, as it itself expressly recognized. (*Contreras*, 4 Cal.5th at p. 382.)

Second, and perhaps more important, *Contreras* only addressed the constitutional implications of *juvenile* offenders sentenced to LWOP. That is not our case here, as defendant Williams was a 24-year-old *adult* when he committed what the trial court found to be "brutal, vicious, callous, [and] cruel" attacks on Does 1 and 2, a finding amply supported by the record evidence. Thus, the  "unique constraints" (*Contreras*, *supra*, 4 Cal.5th at p. 359) and " 'constitutionally different' " standards (*ibid.*, quoting *Miller*, *supra*, 567 U.S. at p. 471) applicable to juvenile offenders sentenced to LWOP are inapposite in the instant case. For this reason, we do not find *Contreras* to be controlling authority on our issue.

Like the *Bell* court, we believe that the threat of recidivism by violent sexual offenders—as demonstrated by the Legislature's enactment of several comprehensive statutory schemes to curb such recidivism among such offenders—provides a rational

basis for the Legislature's decision to exclude one-strikers from the reach of section 3051. (See *Johnson v. Department of Justice*, *supra*, 60 Cal.4th at p. 881 [noting a court of review may engage in " ' "rational speculation" ' " as to the justifications for the Legislature's decision, even if that assumption has no foundation in the record]; see also *Turnage*, *supra*, 55 Cal.4th at pp. 74–75 [noting the standard of rationality neither "depend[s] upon whether lawmakers ever actually articulated the purpose they sought to achieve," "[n]or must the underlying rationale be empirically substantiated"]; *People v. Luna* (2012) 209 Cal.App.4th 460, 471 [observing that section 667.61 " 'was enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction' "]; § 667.61, subds. (a), (c) & (d) [requiring a punishment of 25 years to life to any person who engages in one or more "circumstances" during the commission of various qualifying felony sex crimes].)

Given the deferential standard we apply in determining rationality for equal protection purposes (see *Turnage*, *supra*, 55 Cal.4th at p. 74), and given our view that the risk of recidivism provides a rational basis for the Legislature to treat violent felony sex offenders sentenced under the one-strike law differently than murderers or others who commit serious crimes, we reject defendant's equal protection challenge to subdivision (h) of section 3051.

F.  *Fines, Fees, and Assessments*

As noted, at sentencing the court imposed on defendant a $10,000 restitution fine (former § 1202.4, subd. (b)) and a suspended matching parole revocation fine

(§ 1202.45).  The court also imposed a $520 court operations assessment fee (§ 1465.8); a $390 criminal conviction assessment fee (Gov. Code, § 70373); a $154 criminal justice administration fee (*id.*, § 29550); a $500 sex registration fee (§ 290.3); and a $39 theft fine (§ 1202.5).  Defendant did not object to the imposition of any such fines, fees, and assessments, including on the ground of inability to pay.

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant claims the court erred in imposing on him such fines, fees, and assessments without first conducting an ability-to-pay hearing.  *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373" (*Dueñas*, at p. 1164); and that, although "section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of *any* restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164, italics added.)  Defendant seeks remand for an ability-to-pay hearing.

Fortunately, our high court is now poised to resolve the *Dueñas* "issue," having granted review in this court's case of *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*)

55

(rev. granted Nov. 13, 2019, S257844).[19] In *Kopp*, a majority of this court agreed with the conclusion in *Dueñas* that due process required the court to conduct an ability-to-pay hearing before it imposed on defendants court facilities and court operations assessments under section 1465.8 and Government Code section 70373, respectively, after a codefendant at sentencing had objected on the ground of inability to pay. (*Kopp*, at p. 95.) However, the majority disagreed with *Dueñas* that such a hearing was required for the restitution fines imposed under section 1202.4, inasmuch as those fines were above the $300 statutory minimum. (*Kopp*, *supra*, at p. 96; § 1202.4, subd. (c).)

Unlike the defendant(s) in *Kopp*, defendant here did not object at sentencing to the imposition of any of the fines, fees, and assessments, including the $10,000 restitution fine. (See former § 1202.4, subds. (b) [restitution fine shall be a minimum of $300 and a maximum of $10,000 for a person convicted of a felony] & (c) [inability to pay restitution fine may be considered if the amount of the fine is above the statutory minimum].) Pending further guidance from our high court, we thus conclude defendant forfeited on appeal any "right" to an ability-to-pay hearing.

In any event, because defendant is serving a very lengthy prison sentence, even absent forfeiture we conclude he has the ability to pay such fines, fees, and assessments through wages he will earn in prison. (See *People v. Jones* (2019) 36 Cal.App.5th 1028,

---

[19] We note several courts have declined to follow *Dueñas*, concluding that due process principles do not require determination of a defendant's present ability to pay as a condition to the imposition of fines, fees, and assessments. (See e.g., *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329 (rev. granted Nov. 26, 2019, S258946); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)

1035 [noting prison wages range from a minimum of $12 to about $56 per month depending on the prisoner's skill level]; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's ability to obtain prison wages]; § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].)

DISPOSITION

Judgment affirmed.


BENKE, Acting P. J.

WE CONCUR:



HUFFMAN, J.



HALLER, J.